## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PROJECT SOUTH<br>and CENTER FOR CONSTITUTIONAL RIGHTS,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; UNITED STATES DEPARTMENT OF JUSTICE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; and UNITED STATES DEPARTMENT OF STATE,<br><br>*Defendants.* | Civil Action No. 21-cv-8440<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1.     Plaintiffs Project South and Center for Constitutional Rights (CCR) bring this action under the Freedom of Information Act (FOIA), 5 U.S.C. §§ 552 *et seq.*, to compel the release of agency records improperly withheld by Defendants, U.S. Immigration and Customs Enforcement (ICE), U.S. Department of Homeland Security (DHS), United States Citizenship and Immigration Services (USCIS), U.S. Department of Justice Executive Office for Immigration Review (EOIR), and U.S. Department of State (DOS).

2.     Plaintiffs submitted three FOIA requests to Defendants in April and June of 2021, seeking records concerning recent removals of Cameroonians into an area of known violent conflict, specifically regarding deportation flights that occurred in late 2020 and early 2021. The

FOIA requests focus on (1) data regarding the demographic information of persons on deportation flights to Cameroon between August 2020 and the inauguration of President Biden on January 20, 2021, including the nature and status of immigration relief requested; and (2) correspondence and communications among ICE officials and relevant government officials regarding removals of Cameroonians and conditions in Cameroon between August 1, 2020 and February 26, 2021.

3.      Despite grave public concerns over the treatment of Black immigrants and the disregard of the humanity and due process rights of Cameroonian migrants, Defendants have disclosed no information about the policies and communications regarding the removal of Cameroonians to Cameroon or the data underlying the dramatic increase of removal flights to Cameroon at the end of the Trump Administration and beginning of the Biden Administration. The lack of information raises a question as to whether the increase in removals was a targeted form of retaliation against Cameroonians and other Black migrants.

4.      To address the urgent need for such critical information, Plaintiffs sought records including communications, policies, and data relating to the removal of Cameroonians to Cameroon and requested a fee waiver and expedited processing for each of the three requests. *See* Ex. 1, FOIA Request Letters on behalf of Project South, Southern Poverty Law Center ("SPLC"), and the Center for Constitutional Rights ("CCR") (dated April 26, 2021 & June 17, 2021) ("Plaintiffs' Requests"). The public has a compelling interest in understanding Defendants' communications and policies on the removals of migrants into areas of known violent conflict and whether Cameroonian and other Black migrants were disproportionately targeted for removal between August 2020 and January 2021. The public also has a time-sensitive need to obtain accurate information about Defendants' practices in order to engage in

advocacy and dialogue around executive policies on immigration enforcement and to meaningfully participate in ongoing discussions regarding the treatment of Black immigrants by DHS and ICE.

5.       Defendants have unjustifiably failed to produce information requested by Plaintiffs. To vindicate the public's statutory right to information about immigration practices and policies, Plaintiffs seek declaratory, injunctive, and other appropriate relief to compel Defendants to immediately process Plaintiffs' Request and release records that they have unlawfully withheld.

## JURISDICTION AND VENUE

6.       This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(C)(i). This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2).

7.       Venue lies in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(e) and 1402(a), as CCR resides in this district.

## PARTIES

8.       Plaintiff Project South, founded as the Institute to Eliminate Poverty & Genocide in 1986, is a non-profit organization based in Atlanta, Georgia. Project South's work is rooted in the legacy of the Southern Freedom Movement and has a mission of cultivating strong social movements in the South. One of Project South's primary work areas is educating the public with know-your-rights workshops and releasing toolkits for advocacy and organizing. These and other materials are available through Project South's website, https://projectsouth.org/, which addresses the issues on which the organization works. In addition, Project South regularly issues press releases, has an active social media presence with thousands of followers, and produces

periodicals that reach members with education, organizing updates, and consciousness-raising political analysis on poverty, race, global struggles, and youth realities. Project South also produces community-based reports to share knowledge, increase access to movement histories, and amplify movement victories.

9.      Plaintiff CCR is a non-profit, public interest legal and advocacy organization that engages in the fields of civil and international human rights. CCR's diverse issue areas include litigation and advocacy around immigration, as well as racial and ethnic profiling. One of CCR's primary activities is the publication of newsletters, know-your-rights handbooks, legal analysis of current immigration law issues, and other similar materials for public dissemination. These and other materials are available through CCR's Development, Communications, and Advocacy Departments. CCR operates a website, http://ccrjustice.org, which addresses the issues on which the Center works. CCR staff members often serve as sources for journalists and media outlets, including on issues related to racial justice, racial discrimination, and immigrant rights. In addition, CCR regularly issues press releases, has an active social media presence with thousands of followers, and also issues regular email updates sent to over 50,000 supporters about developments and news pertaining to CCR's work.

10.     Defendant DHS is a Department of the Executive Branch of the United States tasked with overseeing, inter alia, immigration enforcement, border security, immigration detention, and immigration and citizenship benefits.  Its component agencies include United States Immigration and Customs Enforcement (ICE), United States Customs and Border Protection (CBP), and United States Citizenship and Immigration Services (USCIS).

11.     Defendant ICE is a component of DHS that enforces immigration and customs laws and is responsible for the detention and removal of immigrants. It has offices in all 50 states.

12.     Defendant USCIS is a component of DHS responsible for overseeing lawful U.S. immigration processes.

13.     Defendant EOIR is responsible for adjudicating cases arising from U.S. immigration laws through immigration court proceedings, appellate reviews and administrative hearings.  EOIR is a component of the U.S. Department of Justice, a Department of the Executive Branch of the United States, and operates under the authority of the U.S. Attorney General. Its subcomponent agencies include the Board of Immigration Appeals (BIA).

14.     Defendant DOS is a Department of the Executive Branch of the United States responsible for coordinating with other nations to facilitate the repatriation of foreign nationals whom the U.S. immigration system has ordered removed.

15.     DHS, ICE, USCIS, EOIR, and DOS are "agencies" within the meaning of 5 U.S.C. § 552(f)(1).

## STATEMENT OF FACTS

### I. Background

16.     In October 2020, the Trump administration commenced mass deportations of Cameroonian and other Black immigrants into areas of known violent conflicts.[1] The increase in deportations of Cameroonians and Black migrants raised significant public concern, particularly

---

[1] *E.g.,* Amnesty International, *The U.S. Must Not Deport People To Cameroon* (Oct. 9, 2020) https://www.amnestyusa.org/press-releases/the-u-s-must-not-deport-people-to-cameroon/; U.S. Department of State, Bureau of Democracy, Human Rights and Labor, *Cameroon 2018 Human Rights Report,* https://www.state.gov/wp-content/uploads/2019/03/Cameroon-2018.pdf (detailing conflict and human rights concerns in Cameroon).

because of the numerous reports detailing the U.S. Immigration and Customs Enforcement's (ICE) use of torture to coerce migrants into signing deportation orders.[2]

17.     U.S. Immigration and Customs Enforcement (ICE) officers have an appalling record of human rights abuses committed against individuals in ICE custody.[3] Black immigrants are often disproportionately impacted by ICE's abuse, as a result of discriminatory policing tactics that lead to the targeting of Black migrants for ICE detention and deportation,[4] as well as the prevalence of anti-Black racism within the immigration legal system.[5] In October and November 2020, immigration advocacy groups submitted civil complaints to the Department of Homeland Security (DHS) Office of Civil Rights and Civil Liberties (CRCL) and the DHS Office of the Inspector General (OIG) detailing ICE's violent and coercive tactics used to force Cameroonian asylum seekers to sign deportation paperwork.[6] The complaints detail abhorrent

---

[2] *E.g.*, Julia Ainsley, *Cameroonian asylum seekers pulled off deportation plane amid allegations of ICE abus*e, NBC News (Oct. 14, 2020), https://www.nbcnews.com/politics/immigration/cameroonian-asylum-seekers-pulled-deportation-plane-amid-allegations-ice-abuse-n1243468; Julian Borger, *US ICE officers 'used torture to make Africans sign own deportation orders,'* The Guardian (Oct. 22, 2020), https://www.theguardian.com/us-news/2020/oct/22/us-ice-officers-allegedly-used-torture-to-make-africans-sign-own-orders.

[3] *See e.g.,* Sarah Paoletti & Azadeh Shahshahani, *ICE detention has now been referred to as 'torture'-- the US government will surely have to pay reparations*, The Independent (June 28, 2021), https://www.independent.co.uk/voices/ice-detention-torture-reparations-b1874387.html.

[4] *See* Black Alliance for Just Immigration & NYU School of Law Immigrant Rights Clinic, *The State of Black Immigrants* (Jan. 2020), http://baji.org/wp-content/uploads/2020/03/sobi-fullreport-jan22.pdf; Jack Herrera, *Black Immigrants Matter*, The Nation (Mar. 24, 2021), https://www.thenation.com/article/society/black-immigrants-asylum-deportation/.

[5] *See, e.g.,* SIFI Louisiana, Southern Poverty Law Center to Alejandro Mayorkas, *et al.*, *Complaint Re: Call for U.S. Immigration and Customs Enforcement (ICE) to End Contracts due to Abusive, Inhumane, and Racially Discriminatory Practices at Pine Prairie ICE Processing Center and Allen Parish Public Safety Complex, Louisiana* (July 28, 2021), *available at* https://www.splcenter.org/sites/default/files/28_july_2021_complaint_and_call_to_close_pine_prairie_and_allen_parish.pdf.

[6] Freedom for Immigrants *et al.* to Diane L. Witte *et al.*, *Complaint Re: Immigration and Customs Enforcement Officers' Use of Torture to Coerce Immigrants Into Signing Immigration Documents at Adams County Correctional Facility* (Oct. 7, 2020), *available at* https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5f7f17f39e044f47175204fb/1602164723244/Re+CRCL+Complaint+ICE%27s+Use+of+Torture+to+Coerce+Immigrants+to+Sign+Immigration+Documents+at+Adams+County+Correctional+Facility.pdf.; Freedom for Immigrants *et al.* to Patricia Nation & Joseph V. Cuffari, *Re: U.S. Immigration and Customs Enforcement (ICE)'s Pattern of Torture in Signing of Deportation Documents for Cameroonian Migrants* (Nov. 5, 2020), *available at* https://www.splcenter.org/sites/default/files/crcl_complaint_ice_s_pattern_of_torture_in_signing_of_deportation_documents_for_cameroonian_migrants.pdf.

ICE tactics such as the use of pepper spray, threatening violence, and forcibly taking fingerprints for use on deportation papers.[7] Following these complaints, ICE deported numerous Cameroonians subject to mistreatment and abuse, and upon arrival in Cameroon, a number of Cameroonians were further detained by the Cameroonian government, forced to pay bribes to secure their freedom, and stripped of vital identification documents.[8]

18.     The United States government was well aware of the dangerous situation in Cameroon. In October 2019, then President Donald Trump had announced that the U.S. would terminate the eligibility of Cameroon for trade preference benefits under the African Growth and Opportunity Act (AGOA) in January 2020, due to persistent gross violations of internationally recognized human rights. Speaking on behalf of the administration, Deputy U.S. Trade Representative C.J. Mahoney stated, "The U.S. government remains deeply concerned about persistent gross violations of human rights being committed by the Cameroonian government against its own citizens."[9] Despite this and other acknowledgements by the U.S. government of the dire and unsafe situation in Cameroon, removal of detained Cameroonians into these conditions continued.

19.     In December 2020, Human Rights Watch called on the U.S. Government to halt these deportations into areas of conflict, cautioning that hundreds of Cameroonians had been killed in the Anglophone North-West and South-West regions.[10] Disregarding these pleas, throughout the fall of 2020 and into early 2021, ICE continued to deport Cameroonian and other African migrants despite the life-threatening situations they faced in their home countries, and

---

[7] *Id.*

[8] John Washington, *Cameroonian Asylum Seekers Say They Face Violent Persecution upon Deportation*, The Nation (Nov. 9, 2020), https://www.thenation.com/article/politics/cameroon-asylum-deportation-immigration/.

[9] *President Trump Terminates Trade Preference Program Eligibility for Cameroon*, Office of the United States Trade Representative, Executive Office of the President (October 31, 2019), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2019/october/president-trump-terminates-trade (last visited Oct. 12, 2021).

[10] *See* Human Rights Watch, *US: Protect Cameroonians From Deportation* (Dec. 18, 2020), https://www.hrw.org/news/2020/12/18/us-protect-cameroonians-deportation.

despite reports that individuals previously deported went missing upon arrival.[11] The government deported asylum seekers despite the fact that many individuals still had pending immigration court proceedings at the time of their deportation, displaying ICE's callous disregard for immigrants' due process rights.[12]

20.     While some immigrants involved in the ongoing complaints were pulled off the deportation flights,[13] often referred to as 'death flights,' the U.S. government deported an unknown number of Cameroonian and other African asylum seekers between August 1, 2020 and January 19, 2021. More than 40 members of Congress urged President Biden to stop these deportations, noting that "[c]ivilians in Cameroon are caught between multiple and complex armed conflicts between Anglophone separatists, the government, and Boko Haram (a jihadist terrorist group)."[14] As noted by Congress, the concerns raised by these deportation flights are heightened by the ongoing COVID-19 pandemic.[15] At the time of the deportations, the Centers for Disease Control and Prevention (CDC) noted that Cameroon was at a "Very High Level" of COVID-19 cases.[16]

21.     Cameroon continues to face an internal conflict that is forcing people to flee to the U.S. to seek safety, as demonstrated by the ongoing and increasing concerns among U.S. public officials and members of the international community. On April 1, 2021, Al Jazeera reported that worsening violence in Cameroon's Anglophone regions is taking an increasingly heavy toll on

---

[11] Julian Borger, *U.S. to send asylum seekers home to Cameroon despite 'death plane' warnings*, The Guardian (Nov. 9, 2020), https://www.theguardian.com/us-news/2020/nov/09/us-to-send-asylum-seekers-home-to-cameroon-despite-death-plane-warnings.
[12] *Id.*
[13] *See* n.2, *supra*.
[14] *See* Letter from U.S. Senator Van Hollen *et al*. to President Biden and DHS Sec'y Mayorkas. (Feb.17, 2021), *available at* https://www.vanhollen.senate.gov/imo/media/doc/210217%20TPS%20Cameroon%20On%20Letterhead%20Letter_Final.pdf.
[15] *Id.*
[16] *Id.*

civilians.[17] Additionally, on April 7, 2021, eleven human rights, civil liberties, faith groups, and others wrote a statement demanding the U.S. end military assistance to Cameroon and referenced the high number of Cameroonian asylum seekers in the U.S.[18] Amnesty International revealed research in July 2021 demonstrating the horrific scope of violence and the ongoing crisis in Cameroon's Anglophone regions, and emphasized the immediate need for international responses to support Cameroonian refugees.[19]

22.     In response to the continuing conflict and public outcry, elected officials have pushed for action to protect Cameroonians in the United States. On July 30, 2021, 20 members of the House Judiciary Committee urged Secretary Mayorkas to designate Cameroon for Temporary Protected Status (TPS) due to the continued humanitarian crisis and the urgent need for assistance.[20] On October 12, 2021, members of the U.S. House of Representatives introduced the Cameroon TPS Act of 2021, a bill to protect Cameroonians from deportation for eighteen months.[21]

23.     The crisis remains one of urgent concern by human rights and international organizations as well as the public. A Human Rights Watch report released on August 2, 2021[22] and an update from the U.N. Office for Coordination of Humanitarian Affairs on September 28

---

[17] *See* Jess Craig, *Violence in Cameroon's Anglophone crisis takes high civilian toll*, Al Jazeera (April 1, 2021), https://www.aljazeera.com/news/2021/4/1/violence-in-cameroon-anglophone-crisis-takes-high-civilian-toll.
[18] *TASSC Endorses Open Letter to U.S. Secretary of State on the "Anglophone Crisis" in Cameroon*, Torture Abolition And Survivors Support Coalition (TASSC) International (April 7, 2021), https://www.tassc.org/news-blog/2021/4/7/tassc-endorses-open-letter-to-us-secretary-of-state-on-the-anglophone-crisis-in-cameroon.
[19] Amnesty International, *Cameroon: Witness testimony and satellite images reveal the scale of devastation in Anglophone regions* (July 28, 2021), https://www.amnesty.org/en/latest/press-release/2021/07/cameroon-satellite-images-reveal-devastation-in-anglophone-regions/.
[20] Letter from Members of U.S. Committee on the Judiciary to Sec.'y Mayorkas of the U.S. Dep't of Homeland Sec. (July 30, 2021), *available at* https://lofgren.house.gov/sites/lofgren.house.gov/files/7.30.21%20Cameroon%20TPS%20Letter.pdf.
[21] *Press Release: Lofgren, Johnson Introduce Bill to Designate Cameroon for Temporary Protected Status* (Oct.12, 2021), *available at* https://lofgren.house.gov/media/press-releases/lofgren-johnson-introduce-bill-designate-cameroon-temporary-protected-status.
[22] Human Rights Watch, *Cameroon: New Abuses By Both Sides* (Aug. 2, 2021), https://www.hrw.org/news/2021/08/02/cameroon-new-abuses-both-sides#.

revealed worsening conditions in Cameroon, including increasing "violence, kidnapping, and attacks," lockdowns across the country, school closures, and worsening food insecurity.[23] On August 12, 2021, The Guardian reported on a lawsuit filed by one impacted individual in an attempt to hold them ICE officials for physically attacking him and exposing him to COVID-19.[24]

24.     Despite persistent and increasing concerns from the public, the press, and elected officials, little to no information has been publicly released regarding the abuses suffered by these Black immigrants as a result of U.S. government actions – information that is critical to holding the federal government accountable and preventing future harm.

## II. Compelling Necessity for Records Sought

25.     There is a desperate need for transparency into how Defendants treat Black immigrants. In recent weeks, Defendants' inhumane actions toward Black immigrants at the Southern border have received urgent and widespread attention from the public and the press.[25] There is a clear connection between DHS's mistreatment of Black Cameroonian asylum-seekers and fellow Black migrants at the U.S.-Mexico border.

---

[23] U.N. Office for Coordination of Humanitarian Affairs, *Cameroon Flash Update: Ban on movements and activities in the North-West and South-West* (Sept. 28, 2021), https://reliefweb.int/report/cameroon/cameroon-flash-update-ban-movements-and-activities-north-west-and-south-west-28.

[24] Julian Borger, *Cameroonian asylum-seeker sues US for alleged assault by ICE officers*, The Guardian (Aug. 12, 2021), https://www.theguardian.com/us-news/2021/aug/12/cameroonian-asylum-seeker-sues-us-for-alleged-assault-by-ice-officers.

[25] *See,.e.g.*, Bill Chappell, *U.S. Border agents Chased Migrants on Horseback: A Photographer Explains What He Saw,* National Public Radio (Sept. 21, 2021), https://www.npr.org/2021/09/21/1039230310/u-s-border-agents-haiti-migrants-horses-photographer-del-rio; Eileen Sullivan and Zolan Kanno-Youngs, *Images of Border Patrol's Treatment of Haitian Migrants Prompt Outrage*, N.Y. Times (Sept. 21, 2021; updated Sept. 27, 2021), https://www.nytimes.com/2021/09/21/us/politics/haitians-border-patrol-photos.html; Savannah Bherman, Lawmakers decry images of Haitian migrants being chased by CBP agents on horses, USA Today (Sept. 21, 2021; updated Oct. 5, 2021), https://www.usatoday.com/story/news/politics/2021/09/21/lawmakers-decry-images-mounted-cbp-agents-chasing-haitian-migrants/5797673001/.

26.     Defendants have withheld critical information from the public that would allow a better understanding of the conditions and treatment to which Defendants subject Black immigrants during the immigration process, and into the decision-making that factors in the deportation processes.

27.     For example, on October 13, 2020, and November 10, 2020, Defendants deported over 80 Cameroonian asylum seekers on charter flights including several who still had pending immigration cases, and attempted to deport two of the eight men who had filed civil rights complaints alleging physical abuse and mistreatment at the hands of ICE.[26]

28.     In addition, immigrant rights advocates assert that Black immigrants are subject to racial discrimination throughout the immigration process.  From disproportionately high denials of credible fear interviews and asylum petitions, to high incidents of disciplinary action while in immigration detention, Defendants appear to subject Black immigrants to disparate treatment during the immigration process. Government agencies should not and cannot engage in discriminatory behavior in violation of the U.S. Constitution and other laws prohibiting discrimination.  The public has a compelling interest in obtaining documentation of Defendants' policies and procedures that result in the disparate treatment of Black immigrants. Unfortunately, the need for transparency in the treatment of Black immigrants during the immigration process remains compelling under the Biden Administration, as evidenced by the inhumane treatment of Haitian immigrants at the Southern Border.  The recent resignation under protest of the U.S.'s top diplomat to Haiti, further highlights the need for transparency from all

---

[26] *See* n.2 *supra.*

federal components that are involved in the immigration and deportation processes of Black immigrants.[27]

29.     Moreover, Plaintiffs and the public have a right to access documents and records that will explain the events and decisions that resulted in the deportation of Black immigrants to countries from which they fled in fear for their lives, and where their lives will again be at great risk. Of particular concern is that Defendants are not only forcibly returning Cameroonians to danger, but the U.S. government has indirectly contributed to enabling the conditions they fled by aiding and abetting the Cameroonian Government's continued practice of human rights violations and atrocities.

30.     Plaintiffs filed their request in response to the alarm expressed by immigrant rights advocates regarding Defendants' discriminatory, violent treatment of Cameroonian immigrants, and ongoing removals to a country where the government continues to engage in human rights violations and atrocities with the implicit support of the U.S. Government, including hundreds of millions of dollars in military aid, hundreds of U.S. military personnel, assistance in training the Cameroonian military, and sales of military equipment to the Cameroonian government.  It is critical for Defendants to provide transparency regarding the continued deportation of Cameroonian and other Black immigrants, as well as the disparately high denial rates of credible fear and asylum applications that Cameroonians and other Black immigrants experience.

31.     Members of the public also have a compelling interest  in understanding the circumstances of the deportations of asylum-seeking Cameroonians, including any agreements between the Cameroonian regime and the U.S. governments.  The public also has a compelling

---

[27] *See*, Lara Jakes and Eileen Sullivan, *A Senior U.S. Diplomat to Haiti Resigns citing the Biden's Administrations 'Inhumane' Deportation Policy;* The New York Times (Sept. 24, 2021), https://www.nytimes.com/2021/09/23/us/politics/haiti-diplomat-resign-biden.html.

interest in accessing information regarding instances of government-sanctioned physical violence against persons in the government's custody, especially where it may be racially motivated. Plaintiffs have a longstanding history and documented capability of disseminating information about government activity, including information gathered in FOIA requests, to educate the public and help inform political debate.

32.     Accordingly, Plaintiffs' Freedom of Information Act Requests and the present action are necessary in order to vindicate the public's statutory right to be informed about the disparate treatment to which Defendants subject Black immigrants during the immigration and deportation processes and the imminent debate on protection for immigrants from Cameroon.

## III. Plaintiffs' Request for Information

33.     On April 26, 2021, Plaintiffs emailed two separate sets of requests for records regarding Cameroonian migrants pursuant to FOIA, 5 U.S.C. § 552, *et seq.*, to each of the Defendants.

34.     Plaintiffs' First Request ("Data Request") seeks several sets of data as well as specific policy-related records that relate to Cameroonian migrants.

35.     Plaintiffs' Second Request ("Communications Request") seeks records relating to email and other communications regarding Cameroonian migrants.

36.     In addition to the Data Request and Communications Request, which were sent to Defendants ICE, DHS, EOIR and DOS on April 26, 2021, Plaintiffs sent one request to USCIS relating to data and records regarding Cameroonian migrants on June 17, 2021.

37.     All of Plaintiffs' Requests sought expedited processing under 5 U.S.C. § 552(a)(6)(E)(i)(I), citing a "compelling need" for the information because of the urgent need to

inform the public of the policies and decision-making regarding removals to areas of conflict, specifically with the recent removals of Cameroonian migrants.

38.     All Plaintiffs' Requests also sought a waiver of applicable fees under 5 U.S.C. § 552(a)(4)(A)(iii); 6 C.F.R. § 5.11(b); 22 C.F.R. § 121.16(a); and 28 C.F.R. § 16.10(k), because "disclosure of the requested records is in the public interest because it is likely to contribute significantly to the public understanding of the activities or operations of the government and is not primarily in the commercial interest of the requester." Project South and CCR are non-profit entities with no commercial interest in the records requested, which are crucial to public understanding of Defendants' operations.

**IV. Defendants' Failure to Respond**

39.     On April 26, 2021, Plaintiffs filed both the Data Request and Communications Request with Defendants ICE, DHS, DOS and EOIR via Federal Express and email. On June 17, 2021, Plaintiffs filed their Request with Defendant USCIS via Federal Express and email.

40.     To date, the only records received by Plaintiffs in response to their requests have been 1 set of spreadsheets from EOIR, and a 1-page partially redacted PDF from EOIR.

*ICE Response*

41.     According to FedEx's website, the Data Request and Communications Request were both received and signed for by Defendant ICE on April 28, 2021.

42.     Both the Data Request and Communications Request were sent via email to "ice-foia@dhs.gov" on April 26, 2021.

43.     On September 23, 2021, Plaintiffs received an email from ICE acknowledging the Communications Request. In the email, ICE stated that it granted Plaintiffs' request for expedited processing. Coming five months after Plaintiffs had filed the FOIA Request, with no indication of when production would begin, this email effectively denied expedited processing while simultaneously acknowledging that Plaintiffs were entitled to it. Further, the email failed to grant Plaintiffs' request for a fee waiver.

44.     To date, Plaintiffs have never received any acknowledgement or response from ICE to their Data Request.


*Executive Office of Review Response to Data Request*

45.     According to FedEx's website, the Data Request was received and signed for by Defendant EOIR on April 28, 2021.

46.     The Data Request was sent via email to "EOIR.FOIARequests@usdoj.gov" on April 26, 2021.

47.     In a letter sent via email dated May 3, 2021, Defendant EOIR issued a "First Response" to Plaintiffs' Data Request and stated that in regards to paragraphs 1 and 3-6 of Plaintiffs' Data Request, EOIR had no responsive records. EOIR also indicated that it was processing paragraph 2 of Plaintiffs' Data Request.

48.     In an email dated May 3, 2021, Defendant EOIR denied Plaintiffs' request for expedited processing of their Data Request.

49.     To date, EOIR has not responded to Plaintiffs' request for a fee waiver regarding their Data Request.

50.     In a letter sent via email dated May 5, 2021, Defendant EOIR issued a "Final Response" to Plaintiffs' Data Request and stated that in regards to paragraph 2 of Plaintiffs' Data Request, EOIR had conducted a search and found responsive records, and was providing "partial access" to those records to Plaintiffs. EOIR produced one set of spreadsheets to Plaintiffs along with the letter.

51.     On July 9, 2021, Plaintiffs appealed EOIR's determination that its search for records responsive to the Data Request was adequate.

52.     On July 22, 2021, EOIR sent Plaintiffs a letter acknowledging the appeal in regards to the Data Request.

53.     On July 22, 2021, EOIR sent Plaintiffs a "Supplemental Response" which stated an additional search for records responsive to paragraph 1 of the Data Request had been done. EOIR produced one page of partially-redacted records to Plaintiffs.

54.     On September 10, 2021, Plaintiffs appealed EOIR's July 22, 2021 "Supplemental Response" as inadequate.

55.     To date, Plaintiffs have not received any other correspondence from EOIR regarding the Data Request.

*Executive Office of Review Response to Communications Request*

56.     According to FedEx's website, the Communications Request was received and signed for by Defendant EOIR on April 28, 2021.

57.     The Communications Request was sent via email to "EOIR.FOIARequests@usdoj.gov" on April 26, 2021.

58.     In an email dated May 3, 2021, Defendant EOIR denied Plaintiffs' request for expedited processing of their Communications Request.

59.     In an email dated May 3, 2021, Defendant EOIR stated that Plaintiffs' Communications Request would "require [EOIR] to conduct an unreasonably burdensome search." The email directed Plaintiffs to "clarify" our Communications Request and if we did not, EOIR would "administratively close" the request in 30 days.

60.     On May 29, 2021, Plaintiffs sent EOIR an email directing EOIR not to close Plaintiffs' Communications Request. Plaintiffs attached a letter, dated May 28, 2021, to the email appealing EOIR's denial of expedited processing regarding the Communications Request and also further clarifying why EOIR should not administratively close Plaintiffs' request. Plaintiffs' May 28, 2021 letter was also sent to EOIR via Federal Express.

61.     On June 1, 2021, EOIR sent Plaintiffs an email stating that Plaintiffs had not clarified our Communications Request, and that the request had now been administratively closed.

62.     On June 23, 2021, Plaintiffs received a letter from the Department of Justice's Office of Policy ("DOJ-OIP") in response to our appeal of EOIR's response to Plaintiffs' Communications Request. The DOJ-OIP affirmed EOIR's decision to close Plaintiffs' request.

*Department of Homeland Security Response to Data Request*

63.     According to FedEx's website, the Data Request was received and signed for by Defendant DHS on April 28, 2021.

64.     The Data Request was sent via email to foia@hq.dhs.gov on April 26, 2021.

65.     In a letter sent via email dated May 4, 2021, Defendant DHS confirmed receipt of Plaintiffs' Data Request and stated that due to the nature of the records sought, the agency would take an additional 10 days to make a determination, as permitted by law. DHS also denied Plaintiffs' request for expedited processing, and "conditionally granted" Plaintiffs' request for a fee waiver. DHS's letter also stated that DHS "will only address items 1, 2, 9-14 of your request" but did not explain why other parts of Plaintiffs' Data Request would not be addressed.

66.     On May 28, 2021, Plaintiffs appealed DHS's response as to the agency's denial of expedited processing, the granting of only a "conditional" fee waiver, and its refusal to address all items contained in Plaintiffs' Data Request.

67.     DHS acknowledged Plaintiffs' appeal in a letter dated July 19, 2021.

68.     To date, Plaintiffs have not received a response to our appeal or any further correspondence from DHS regarding Plaintiffs' Data Request. Defendant DHS has not produced any responsive records to Plaintiffs' Data Request.

*Department of Homeland Security Response to Communications Request*

69.     According to FedEx's website, the Communications Request was received and signed for by "Defendant DHS on April 28, 2021.

70.     The Communications Request was sent via email to foia@hq.dhs.gov on April 26, 2021.

71.     In a letter sent via email dated May 4, 2021, Defendant DHS confirmed receipt of Plaintiffs' Communications Request and stated that due to the nature of the records sought, the agency would take an additional 10 days to make a determination, as permitted by law. DHS also denied Plaintiffs' request for expedited processing, and "conditionally granted" Plaintiffs'

request for a fee waiver. DHS's letter also stated that DHS "will only address items 1-5 of your request" but did not explain why other parts of Plaintiffs' Communications Request would not be addressed.

72.     On May 7, 2021, Defendant DHS sent Plaintiffs a response that was almost identical to its May 4, 2021 response, however this response did not indicate that only certain parts of Plaintiffs' Communications Request would be addressed.

73.     On May 11, 2021, Plaintiffs received an email from the DHS Privacy Office regarding our Communications Request. The email stated that a "backend search came back extremely large" and DHS requested Plaintiffs "give [DHS] specific government officials or specific offices we can search that can narrow [Plaintiffs'] request and better tailor a search." DHS indicated that it would place our Communications Request "on hold" until they heard from Plaintiffs.

74.     On May 28, 2021, Plaintiffs appealed DHS's response(s) as to the agency's denial of expedited processing and the granting of only a "conditional" fee waiver.

75.     On June 3, 2021, Plaintiffs responded to DHS's May 11, 2021 email regarding potentially narrowing our Communications Request, and indicated that DHS should continue processing the request, as it is required to do under FOIA, no matter how "large" search results may be. Plaintiffs also requested more information from DHS on what "extremely large" referred to in DHS's original email.

76.     On June 3, 2021, DHS responded to Plaintiffs' email with more information about why its search had returned a large amount of information, and included several suggestions for narrowing Plaintiffs' Communications Request.

77.     On June 28, 2021, Plaintiffs responded to DHS's June 3, 2021 email, and indicated we would like to speak with DHS on the phone to try and discuss potentially narrowing the Communications Request. Plaintiffs proposed several periods of time when they would potentially be available. Plaintiffs did not hear back from DHS as to arranging a time to talk.

78.     On June 30, 2021, Plaintiffs received an email from DHS indicating DHS had tried to call Plaintiffs that afternoon. DHS also included some suggested search terms and additional information regarding ways to potentially narrow the request, including narrowing the custodians searched to only "Political Appointees, SES, GS-15" employees.

79.     On July 9, 2021, Plaintiffs responded to DHS's June 30, 2021 email, stating that we continued to believe our original request was not overbroad. Plaintiffs asked which DHS "offices, subcomponents and departments" would be covered by the search if narrowed to include only "Political Appointees, SES, GS-15" employees.

80.     On July 13, 2021, Plaintiffs received an email from DHS indicating that "DHS Office of Strategy, Policy, and Plans, Office of the Executive Secretary | Homeland Security – DHS, Office of the General Counsel | Homeland Security, Office of Legislative Affairs | Homeland Security, Office of Public Affairs - Department of Homeland Security, Office of Intergovernmental Affairs | Homeland Security, Science and Technology | Homeland Security" would be included in a search of "Political Appointees, SES, GS-15" employees.

81.     On July 16, 2021, Plaintiffs responded to DHS's July 13, 2021 email, and stated that Plaintiffs would agree to narrowing the search to those custodians and offices along with two additional offices within DHS: Enforcement and Removal HQ and ICE and USCIS General Counsel. Plaintiffs stated that we "reserve the right to request additional searches if it comes to

light that other offices, components or divisions within DHS HQ are involved in the subject matter at issue in our FOIA request."

82.     On July 19, 2021, DHS emailed Plaintiffs an acknowledgement letter which stated that DHS had received Plaintiffs' "amended request" on July 16, 2021. The letter also indicated that Plaintiffs' request had been referred to USCIS.

83.     DHS acknowledged Plaintiffs' May 28, 2021 appeal of expedited processing and conditional fee waiver in a separate letter dated July 19, 2021.

84.     On July 23, 2021, Plaintiffs responded to DHS's July 13, 2021 email, indicating Plaintiffs' confusion regarding DHS's acknowledgment of an "amended request" and stating that Plaintiffs' position is that DHS's statutory timeline to make a determination on our request began May 4, 2021, and not July 16, 2021.

85.     On July 26, 2021, DHS acknowledged this response and stated that they were currently conducting its search.

86.     To date, Plaintiffs have heard nothing further from DHS regarding their Communications Request.

*Department of State Response to Data Request*

87.     According to FedEx's website, the Data Request was received and signed for by Defendant DOS on April 28, 2021.

88.     The Data Request was sent via email to "FOIARequest@state.gov" on April 26, 2021.

89.     In an email to Plaintiffs' dated May 4, 2021, Defendant DOS acknowledged Plaintiffs' Data Request and stated that DOS denied "item 2" of Plaintiffs' request for not

reasonably describing the records sought; told Plaintiffs items 3-5 were under the purview of ICE; told Plaintiffs that item 6 is under the purview of USCIS; and denied Plaintiffs' request for expedited processing. The letter also stated that DOS would address Plaintiffs' request for a fee waiver "at a later date."

90.     In a letter dated May 28, 2021, Plaintiffs appealed DOS's denial of expedited processing and DOS's refusal to search for records responsive to item 2, as well as requesting DOS's basis for not searching for records responsive to items 3-5.

91.     In a letter dated June 22, 2021, DOS denied Plaintiffs' appeal and stated that its response "represents the Department's final determination on expedited processing and exhausts all administrative remedies available to you."


*Department of State Response to Communications Request*

92.     According to FedEx's website, the Communications Request was received and signed for by Defendant DOS on April 28, 2021.

93.     The Communications Request was sent via email to "FOIARequest@state.gov" on April 26, 2021.

94.     In an email to Plaintiffs' dated May 4, 2021, Defendant DOS acknowledged Plaintiffs' Communications Request and denied Plaintiffs' request for expedited processing. The letter also stated that DOS would address Plaintiffs' request for a fee waiver "at a later date."

95.     In a letter dated May 28, 2021, Plaintiffs appealed DOS's denial of expedited processing.

96.     In a letter dated June 22, 2021, DOS denied Plaintiffs' appeal and stated that its response "represents the Department's final determination on expedited processing and exhausts all administrative remedies available to you."

*USCIS Response to Plaintiffs' Request*

97.     Plaintiffs' Request to USCIS was sent via email to uscis.foia@uscis.dhs.gov on June 17, 2021.

98.     In a letter dated June 22, 2021, USCIS acknowledged Plaintiffs' FOIA request, denied Plaintiffs' request for expedited processing and granted Plaintiffs' request for a fee waiver.

99.     On July 9, 2021, Plaintiffs appealed USCIS's denial of Plaintiffs' request for expedited processing.

100.    In a letter dated August 24, 2021, USCIS denied Plaintiffs' July 9, 2021 appeal.

101.    To date, Plaintiffs have not received any further correspondence from USCIS. Defendant USCIS has not produced any responsive records to Plaintiffs' Request.

## CLAIMS FOR RELIEF

### First Claim for Relief:

### Violation of FOIA for Failure to Disclose and Release Responsive Records

102.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 101 as if repeated and incorporated herein.

103.    By failing to make a determination on Plaintiffs' FOIA requests within the mandated statutory timeframe, by failing to disclose and release the requested records, and by

failing to conduct an adequate search reasonably calculated to uncover responsive records, Defendants have violated the public's right, advanced by the Plaintiffs, to agency records under 5 U.S.C. §§ 552 *et seq*.

### Second Claim for Relief:

### Violation of FOIA for Improper Denial of Plaintiffs' Request for Expedited Processing

104.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 103 as if repeated and incorporated herein.

105.    By denying or failing to respond timely to Plaintiffs' requests for expedited processing, Defendants have violated Plaintiffs' rights under 5 U.S.C. § 552(a)(6)(E) and Defendants' own regulations.

### Third Claim for Relief:

106.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs one through 105 as if repeated and incorporated herein.

107.    By failing to respond or failing to non-conditionally grant Plaintiffs' requests for fee waivers, Defendants have denied Plaintiffs' rights under 5 U.S.C. § 552(a)(4)(A)(iii) and Defendants' own regulations.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)    Order Defendants immediately to make a full, adequate, and expedited search for the requested records;

(b)    Order Defendants to engage in expedited processing in this action;

(c)    Enjoin Defendants DHS, ICE, DOS and DOJ EOIR from assessing fees or costs for the processing of the FOIA Request;

(d)    Order Defendants to disclose the requested records in their entirety and make copies available to Plaintiffs no later than ten days after the Court's order;

(e)     Award Plaintiffs their costs and reasonable attorney's fees incurred in this
action as provided by 5 U.S.C. § 552(a)(4)(E); and

(f)     Grant each other and further relief as this Court may deem just and proper.


Dated: October 13, 2021
        New York, NY

\s\ Samah Sisay
Samah Sisay
Ghita Schwarz
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6484
ssisay@ccrjustice.org
gschwarz@ccrjustice.org

\s\ Azadeh Shahshahani
Azadeh Shahshahani
Priyanka Bhatt
PROJECT SOUTH
9 Gammon Ave SE
Atlanta, GA 30315
404-622-0602
azadeh@projectsouth.org
priyanka@projectsouth.org

\s\ Luz V. Lopez
Luz V. Lopez
SOUTHERN POVERTY LAW CENTER
1101 17th St., NW, 7th Floor,
Washington, DC 20036
212-355-4471
luz.lopez@splcenter.org